All right, our last case for argument is 23-1184, SnapRays v. Lighting Defense Group. Mr. Williams, please proceed. Good morning, and may it please the Court, Elliot Williams with my colleague Nathan Brunette of Stull Reeves on behalf of the plaintiff appellant, SnapPower, I'd like to reserve five minutes for rebuttal. I want to highlight three points that will cover an argument from the outset. First point, SnapPower's Amazon listings reflect sales and marketing activities in the real world in Utah. Point two, the patentee's purpose in sending a patent infringement complaint to Amazon was to stop those Utah-based sales activities and to get SnapPower's attention by doing so. Point three, this Court's precedent protects patentees from remote personal jurisdiction in declaratory judgment actions when the patentees are sending cease and desist letters, but not when they're engaged in extrajudicial patent enforcement. But this is a triangular kind of case, isn't it? This is closer to Dudnikoff and Bancroft from the Ninth and Tenth Circuit, but those aren't binding. We don't have a binding case on your facts. That's correct, Your Honor. Your Honor, this case raises issues of fact and the new technological context of an e-commerce enforcement this Court hasn't directly considered before, and applying the constitutional test to these facts requires reversal. The patentee purposefully directed its takedown notice at a resident of the forum state. The takedown targeted only SnapPower, took aim at 20 of SnapPower's most valuable listings on Amazon, pulled the trigger, starting a three-week clock after which Amazon would delete those listings and the corresponding sales and marketing activities in Utah. Do you think it matters at all? Because I noticed in the District Court's opinion, they said, I think they said at one point that the patentee had no knowledge of where the alleged infringer was located, meaning no knowledge of the state of Utah, the fact that these activities were occurring in Utah. I'm wondering if the purposefully directed language has some sort of knowledge requirement. The District Court got that wrong, and I'm glad you highlighted that, Your Honor. So the pleadings, which have to be taken as true, state that lighting defense groups, the patentee did know that SnapPower was in Utah, and that has been discussed in the record and the patentee has perhaps craftily avoided denying or admitting that fact. So the pleadings have to be taken as true, lighting defense group, the patentee did know that SnapPower was in Utah, and to the extent that is not sufficient, perhaps, to be purposefully directing its activity at Utah, it is, I'm willing to concede, important, as your question suggests, Judge Moore, and that's why that information needs to be corrected in the decision below. And taking that into account, this action... Can you tell us where that allegation appears? Yes, it's Appendix 16, and we find this issue on our brief, page 8, our opening brief. Appendix 16, paragraph number? 10, right? Yeah, I believe it's 9 and 10, and then again at paragraph 20, perhaps. Defendant availed itself, paragraph 10, of the laws of the state of Utah and knew that its actions would harm SnapPower in this district. And I also will highlight that it appears from the facts, and these are also in the of the district court complaint, that the patentee's purpose was to secure a monetary payment from SnapPower. The patentee hasn't accused any other party of infringing, it secured a covenant, it granted a covenant not to sue to Amazon, so there's no patent infringement allegations presented to Amazon. And when there were correspondence between the parties, the patentee offered to sell the patents, the entire portfolio, to SnapPower, and so there's no other infringement targets in view other than SnapPower. So the district court erred by focusing its analysis on the physical endpoints of the transmission of the Amazon complaint from the patentee to Amazon, and this is where  the district court assigned the location of Washington to Amazon, under the assumption that that's where its corporate headquarters are. But in truth, the communication was electronic, it went to the Amazon e-commerce platform network with the express purpose of removing SnapPower's listings. And the district court erred by focusing on physical endpoints of that transmission instead of on who the complaint was targeting, the district court failed to consider the content, the meaning and the purpose of those infringement allegations, which were to stop SnapPower's activities on Amazon and corresponding activities in Utah. But isn't personal jurisdiction all about location, physical location? Well, that's what makes the e-commerce context so interesting, and the Dunikoff case, which I understand isn't binding on this court, is instructive in that it saw that the e-commerce activities had corresponding physical locations. And I'll quote from Dunikoff, the defendant's express aim in acting was to halt a Colorado-based sale by a Colorado resident. The facts in that case involved a sales listing on eBay, very much like the Amazon listings at issue in this case, and the notice, the infringement notice in Dunikoff was a transmission to eBay, like the transmission to Amazon in this case. And what's helpful in the Dunikoff analysis is that the court saw through all that, that the real target, the purposefully direct activity was at the sales and marketing activity behind the internet listing on eBay, which were located in Colorado, just as SnapPower's sales and marketing activities. And the court continued in Dunikoff, neither the lack of defendant's physical presence in Colorado, nor the fact that they used a California-based entity, that is eBay in that case, to effectuate its purpose diminished the fact that defendant's express aim was at a Colorado sale by a Colorado resident. I'd like to suggest an analogy that an Arizona resident who contracts with a Washington resident to construct a dam across a creek with the intention of flooding an Idaho farmer, so Idaho farmers on the Washington-Idaho border, would never enter into Washington, would never enter into Idaho, but would certainly be subject to personal jurisdiction by a claim in Idaho by the Idaho farmer that the Arizona resident had purposefully directed and intentionally harmed the Idaho farmer's crops. Similarly, here, an Arizona resident contracting with a Washington person, in this case, Amazon, to construct a dam in the stream of commerce that's directed to harm a Utah resident should give rise to personal jurisdiction and certainly satisfies the purposefully directed aspect of the minimum contacts test. Failure to reverse would protect patent owners from declaratory judgment actions when enforcing online through e-commerce marketplaces, which would be a policy akin to this court's red wing shoe policy, protecting patent owners in the context of sending cease and desist letters, but would go beyond the red wing shoe policy and extend that policy to an area that this court has for a long time distinguished, namely extending from two-party communications that could support settlement to third-party communications to enforce the patent outside of court. This court should reverse to prevent such an extension of protection, and reversal is also necessary to maintain the status quo. There's subtle expectations in patentee enforcement activities under Congress's rule, the patent statute. This is how I know from a practical standpoint. Under the APEX program, right now, your client is allowed to continue selling on Amazon because this litigation is ongoing. Is that correct? So, currently, and I haven't heard otherwise, Amazon has allowed the listings to remain online while this case is pending. Amazon could change its mind at any time, but as far as I know, they have not. The listings are online. The APEX program expressly articulates the contours of it. I mean, theoretically, Amazon could change its program, but under the program as articulated, they're allowed to keep selling during the pendency of this case, correct? That's correct, Your Honor. The TC Heartland decision settles expectations that patentees have to bring their infringement claims in the federal courts where the infringer resides and where the infringement occurs. Thus, it is not unfair to require Lightning Defense Group to do the same. The district court's decision enables patent owners to do an end run around the patent venue statute by provoking an infringement contest in court through the e-commerce marketplace. Well, what you're asking for might be regarded as an end run, too. But it's consistent with the rule for the federal courts, and so it's not unfair to the patent owner. If there are no further questions, I will reserve my time for rebuttal. Okay, Mr. Andrews. Thank you, Chief Judge Moore. You may please the Court. Snap Power offers an overly narrow framing of this appeal, calling it an issue of first impression. It is not. There's nothing novel about this appeal. You mean because of the Ninth and Tenth Circuit's decisions? No, I mean because of the relief that Snap Power is seeking is being foreclosed by President and Walden, Abison, Radio Systems, and Max Chief. And as we just heard from Chief Judge Moore... Those cases didn't involve a program like the APEX program, right? They did not, Judge Dike. You are correct. Does that make a difference? I don't believe it does, and I believe that is why I view Snap Power's narrow framing. It's overly narrow, because I don't think that the e-commerce program makes any difference at all on this issue. The Supreme Court made clear in Walden that minimum contacts for specific personal jurisdiction must be created by the defendant themselves, by actions that the defendant himself has. And those contacts must be with the forum state, not with the persons who reside there. So Walden reversed the Ninth Circuit's finding, finding specific personal jurisdiction, and notably that Ninth Circuit case that was reversed based its reasoning on the Bancroft and Dudnikoff decisions. Those decisions that are key and necessary for Snap Power's position. So if we were in the Ninth and Tenth Circuits, do you agree that you'd lose? I do not, Your Honor. I think that subsequent decisions in, I believe, in the Ninth Circuit, at least other circuits, and forgive me for not recalling which specific circuits, have distinguished Dudnikoff, I believe. Okay, but let's assume that Dudnikoff and I forget the name of the Ninth Circuit case were governing authority. You'd lose under those cases, right? As they have been applied subsequent to that, I don't think that I would. And I understand why you're saying that, Judge Dyke. But subsequently in those circuits that have been looking at Dudnikoff and would be following Dudnikoff, they have read it subsequently, and I believe even following Walden specifically, that there must be a specific sale that has been prevented within the forum state in order for that Dudnikoff bank shot analogy to apply. Can you help me understand what case you're talking about? I'm not sure I'm following this. I don't remember this argument. Your Honor, that we have on page 47 of our response brief, note 7, I believe, that numerous courts have found Dudnikoff in opposite for the same reasons as we explained. And so I'm looking quickly through here, and I apologize for not having these. These are, and I misspoke, there's only one Tenth Circuit case in here, and that would relate to Dudnikoff. But the residents, the courts have distinguished Dudnikoff in requiring a specific sale that was foreclosed in the forum district, and that's what happened in Dudnikoff. But they've alleged that lots of sales were prevented from happening. And respectfully, Judge Dyke, no sales were actually prevented from happening. There was certainly a threat, and the threat was created from the... that would have been taken off the website, and the sales would have been prevented, right? Not necessarily, Your Honor, because the APEX program is distinguishable also from the eBay program in Dudnikoff, where the eBay program, when there was a notice of infringement sent, there was an automatic takedown. Now, I understand that SnapPower has tried to characterize the APEX program. I'm not understanding what you're saying. I've read the APEX program. It says you have a couple options if you don't participate in this arbitration, or whatever you want to call it, and you don't bring a declaratory judgment action, your product's going to be taken off the website, right? Yes, it does, Your Honor. I think that's an important distinction. Okay, think of it as they don't want to participate in the APEX program, and their only option then is to file a declaratory judgment action. If they can't file a declaratory judgment action, their product's taken off the website, right? I would say respectfully, and to answer your question directly, yes, if they do not participate, their product would be delisted. There are a couple of important aspects on this, too, Your Honor. First is, as a condition of being an Amazon seller, SnapPower had agreed to participate and be subject to the APEX process. Well, that doesn't mean they have to participate in the arbitration part of it, which, in fact, only is linked to infringement and not invalidity. Well, and respectfully, Your Honor, I think that that would be a decision to be made prior to deciding to list products on Amazon. No, Amazon expressly gave them three alternatives. They are participating in the APEX program by filing a DJ. That was one of the three options APEX expressly gave them. They have not failed to participate in the APEX program. Well, I'm sorry. They, in fact, participated and done exactly one of the things that it allowed. And certainly the APEX program allows that, Your Honor. However, and I think that SnapPower has characterized it in this way itself, that failure to participate in the APEX program, and that is, as Judge Dyke said, the arbitration process, the private arbitration process that Amazon runs for efficiency, that this court, I think, as a policy measure would favor, and the federal courts do favor arbitration. So we should punish them for not agreeing to the arbitration aspect of this? Oh, I don't think this is a punishment at all, Your Honor. I think this is. You should say they don't have a remedy because they didn't participate in that aspect of the program. Now, to be, and I'm sorry to say that again. You're saying that as a policy matter we should say they can't get relief because they didn't participate in the arbitration aspect of the APEX program. I see. And, yes, I think that as a policy matter, that there should be a policy, as there is in the Arbitration Act, to promote private resolution of disputes. There is a policy to not override private arbitration. Now, to be clear. We're not overriding it. The program, the APEX program, as Chief Judge Moore said, gives them three choices. They chose one of them, which is to start a declaratory judgment action. And they did, Your Honor. And they could just start that declaratory judgment action where there is personal jurisdiction. And that is the case here. There is no dispute that they could start a declaratory judgment action. That action would be started in, say, Arizona where lighting defense is resident or in, I think more appropriately in this case, the state of Washington where the action was taken. So, to be clear, this arbitration does not, arbitration process, the APEX process, even if the Amazon listings are taken down, does not leave SNAP power high and dry as would a court ruling. This does not have anywhere close to the same power as a court ruling in determining infringement. I don't understand why you think that has any relevance. If I take purposeful direction at you and prohibit some of your sales but not all of them, somehow that's not personal jurisdiction. I don't understand that argument at all. In this instance, the purposeful direction was to the state of Washington, Your Honor, not to Utah. Your argument just now was it didn't prevent all of their sales. It only presented their Amazon sales. That's right. If a patentee goes after an infringer to prevent some of their sales, that's a problem. It's not some versus all that is the concern. And some of their sales through Amazon, that's the process that Amazon set up to help it avoid infringement actions. To be clear, the Amazon process is not being done as a favor to anybody in my view except Amazon. The fact is that your client contacted Amazon with the idea of causing Amazon to take their product off the website, correct? There's no question about that. That's right, Your Honor. There's no question about that. And the only way that that could be viewed as reaching into Utah would be through how SnapPower construes this case using Dudnikoff and Bancroft. Dudnikoff and Bancroft have been expressly rejected by this court in radio systems and then following on in another analogous situation with the Max Chief case. I don't read those cases as rejecting those decisions. I think that, Your Honor, they are very, very closely analogous where in radio systems the patentee reached out to the patent and trademark office in Virginia with the specific intent of causing the accused infringer's forum in that case, I believe it was Tennessee, to take action against the patent. And this court held that that is not reaching into specifically because this court rejected Dudnikoff and Bancroft. So the fact that the Amazon process happens to be electronic and the USPTO does not happen to be electronic, I don't see any distinction, Your Honor. It is a three-party arrangement and the only way that lighting defense has reached to Amazon could be construed as reaching into Utah would be through a bank shot just like in radio systems. And in radio systems this court rejected expressly the bank shot approach. As Judge Moore said in the previous case this morning, precedent matters. Similarly in Max Chief, there was, I believe, a case filed in California where it was very foreseeable that the accused infringer would have an effect going to Tennessee. There was a three-party arrangement there and yet that was not enough. And in that case this court relied on Walden, which we believe also supports our position, to reject this idea of an indirect reaching into a forum. So based on the reasoning in Walden then, Max Chief re-emphasized that it is not enough for personal jurisdiction that the patent enforcement actions might have effects in the forum. I believe this court said in Max Chief, rather jurisdiction must be based on intentional conduct by the defendant directed at the forum and here is the issue here. The LBG, Lighting Defenses Conduct, was not directed at the forum. It was directed at Washington State. This is no different from a bank shot that Dudnikoff used that this court rejected in radio systems. I see no distinction, respectfully, Your Honor, between having a bank shot run through Amazon as an electronic program and a bank shot run through the U.S. Patent and Trademark Office in Virginia. How was the Patent Office preventing sales in the forum state? Well, the Patent Office was affecting the rights in the forum state and there is no... It wasn't directly affecting any sales, right? No, and there is no... the sales here, Your Honor... It wasn't directly affecting sales? No, I'm sorry, no. No, the Patent Office would have no effect on sales that the Patent Office is ruling. In this instance, there is nothing in the record suggesting that there would be a direct effect on sales or that any sales had been lost. There is in Appendix 144, a declaration from SNAP Power saying that their sales are fulfilled in Utah and that their Amazon listings are posted from an office in Utah. What is missing, and I think this is important, is that sales are not in Utah. I believe it is not in the record, but my assumption for the lack of this portion in the declaration from SNAP Power is that, as would be common with Amazon's operations, the sales would be executed through the state of Washington. And that's where the sales would be blocked. I'm having trouble understanding that argument. Can you explain it to me? I mean, if the infringer is making the product in Utah and shipping it out of Utah, how is that not enough? The sales are being consummated, is my understanding. It's not in the record, Your Honor. And so I'm out on a limb here. Who cares? Who cares where the sales are consummated? The product is made in Utah and shipped from Utah to the ultimate purchaser. So the seller is in Utah. So who cares? Why isn't that enough for personal jurisdiction? Who cares where the sale itself took place, where the contract was signed? Well, I think that Max Chief comes down on the point of this. It doesn't matter where the ultimate effects of the action take place, and Max Chief is straight on this point. It has to be reaching into the forum state. But that's, with all due respect, what I see happening here. You are reaching into the state of Utah to prevent sales from being fulfilled by a Utah company in the state of Utah. That's it. Respectfully, Your Honor, I disagree that SnapPower is reaching into the state of Washington. And the only way that can be construed as reaching into Utah is with a bank shot. And this court has rejected bank shot. Okay. Thank you very much. We have some rebuttal time, please, Mr. Williams. Thank you, Your Honor. I just want to touch on a couple of points in response to Mr. Andrews. First, he referenced the Walden case. I think that case is distinguishable. It's from the Supreme Court. But it addressed an individual defendant acting in the line of duty as a police officer in Georgia. And in that case, jurisdiction over the Georgia defendant in Nevada would have been unreasonable and unfair to hail a Georgia individual police officer into the state of Nevada when he was doing law enforcement in Georgia and the plaintiffs were in Georgia. Have we rejected the bank shot theory? No, Your Honor. But your opposing counsel stated it expressly. You might want to address that. Absolutely, Your Honor. So the radio systems case, which there was some discussion about it, so I'll try to pick up where that left off. And Maxfield. And Max Chief, certainly. Max Chief. Which has no connection to the alleged infringer's sales. There's no stopping of sales activity or stopping of any alleged infringement in that context. It's simply trying to bother the infringer by hindering their patent application. It might be a tortious interference with business concept, but it has nothing to do with enforcement efforts related to a patent. Exactly. Okay. How about Max Chief? Max Chief involved a patent assertion action in California against Staples. And one of the downstream distributors, or maybe it was upstream, someone else in the stream of commerce related to Staples, was in Tennessee. And they thought they would be covered by any injunction that issued from the California court. And so they sued preemptively. And the court said, well, the patent owner hasn't targeted you. And that was true. The patent owner had never named them, had never sent them a letter, had never gone after them. It was simply an incidental effect of whatever injunction might arise from the California litigation. And that's not this case, because Lightning Defense Group only targeted Sam Fowler. Absent any further questions, Your Honor, I will return my time to the court. Okay. I thank both counsel. This case is taken under submission.